LEAR, Judge.
This matter grows out of an automobile accident which occurred August 24, 1963 at approximately 6 o’clock P.M. on Highway 19 about one mile north of Scotlandville, Louisiana. Mrs. Lorene Saxton and her minor daughter were the occupants of one vehicle and Eddie Stewart was the driver of the other. Eddie Stewart was insured by New York Fire & Marine Underwriters, Inc., which was named as co-defendant herein. The Trial Court awarded damages to Mrs. Saxton for herself and for her child. Eddie Stewart and his insurer have prosecuted this appeal from that judgment. Plaintiff did not answer the appeal.
Mrs. Lorene Saxton was operating her 1955 Dodge automobile in a generally northerly direction. Amy Gwendolyn Sax-ton, her minor daughter, was a passenger in the front seat of Mrs. Saxton’s automobile. Mrs. Saxton brings this suit individually and as tutrix of her minor daughter.
Eddie Stewart was driving his 1953 Chevrolet automobile in the opposite direction, southerly, on said highway.
Though the evidence shows that it was still daylight at the time of the accident, shortly prior thereto a very heavy rainstorm had descended upon the countryside and although the roadway at that point is a straight and level two-lane highway, visibility was limited to some extent, the estimates ranging from fifty yards to one block.
The accident occurred as a result of what was almost a head-on collision and it occurred in Mrs. Saxton’s lane of travel.
At the time of the accident Eddie Stewart was admittedly drunk and to further complicate his troubles the windshield wipers on his car were not working.
Eddie Stewart admits his intoxication and can offer no helpful information as to the cause or manner .of the accident.
Mrs. Saxton testified that she first noticed the Stewart automobile when it swerved into her lane of traffic. At this time her windshield wipers were working but she does not recall whether her headlights were on. She stated: “I think my lights were on. I am sure I couldn’t have seen without them.”
She describes the happening of the accident as follows:
A. “Well, I was driving along and I noticed this car as it turned out into my lane and, uh, then the accident occurred.”
The question was asked her:
Q. “Now, how far were you from this automobile that turned into your own lane of traffic when it did so?”
A. “I don’t know about the distance but it was just a short time between the accident.”
She testified that she was driving not more than twenty-five or thirty miles per hour.
The Reverend J. W. Arnold had been following Stewart for some time before this collision. He stated that Stewart was weaving across the center of the highway back into his own lane of travel to the extent that he was afraid to attempt to pass him. He had this to say about the accident:
A. “I followed this car to the Blount Road trying to get by him and I saw that it was too dangerous to try to pass him. He was weaving over in the other lane to where I couldn’t pass him, so it started raining about the Maryland Tank Farm there when *511 we first got to it and just a short ways from there is where he cut over into the left lane and his car flew hack all at once and I stopped ife j}: »
At another point in his testimony, the Reverend Arnold had this to say:
A. “I couldn’t say that I did see the car (Saxton automobile) now until the accident happened, because this man was going back and forth across the road and several cars coming by and all at once he cut over in that lane and that’s when it happened.” (Insertion supplied by the Court.)
He further testified that Stewart was traveling at twenty or twenty-five miles per hour.
Accepting as true that Stewart’s car was traveling at twenty miles per hour and that the Saxton vehicle was traveling at twenty-five miles per hour (the lowest estimate for both vehicles), the combined speed of their vehicles was forty-five miles per hour.
Therefore these vehicles were approaching each other at a combined speed of forty-five miles per hour, or sixty-six feet per second. Assuming that they were a block apart at the time Mrs. Saxton first saw the Stewart vehicle cross over into her lane, this collision occurred approximately 4.4 second later.
Appellants maintain that Mrs. Saxton should be held guilty of contributory negligence on two counts: (1) That she did not have her headlights on, and (2) That she should have pulled to her right to the wide, substantial shoulder which would have offered her a haven of refuge.
As to the first point, there was no proof offered that Mrs. Saxton’s headlights were not on. All testimony on this point is of negative import, except that of Mrs. Saxton, who stated that she was not positive and could not testify under oath that her headlights were burning, but that she was sure she had turned them on because of the reduced visibility occasioned by the rainstorm.
Hence, defendant has not established this salient fact of negligence, if it were so, by that fair preponderance of the evidence required of a pleader of contributory negligence.
Furthermore, if defendant had established this as a fact, it would be seriously questioned by this Court whether this was a sine qua non contributing to the occurrence. But since the fací of the alleged negligence was not proved, its effect need not be considered.
As to the second objection to the finding that Mrs. Saxton was free from negligence contributing to this accident, we find this to be equally without merit.
Giving the interpretation most favorable to the defendant as relates to speed and distance, we find that Mrs. Saxton was offered a maximum of 3.6 seconds to avoid this accident.[1]
On the other hand, if we give plaintiffs the interpretation most favorable to their case, we find that Mrs. Saxton was traveling at thirty miles per hour and Stewart at twenty-five. This makes their combined speed fifty-five miles per hour. At. the same time, the estimated visibility will be reduced to forty yards, in line with Reverend Arnold’s testimony.
At fifty-five miles per hour the vehicles were approaching each other at 86.6 feet per second. Allowing Mrs. Saxton three fourths of a second reaction time, we are left with an intervening distance of 55.8 feet, which means that Mrs. Saxton would have had less than one second to take the evasion action which appellant would impose upon her.
*512 Actually, the Court feels that the time element lies somewhere in between the minimum and maximum described above, which are based upon normal driving conditions. But we do not have normal driving conditions in the case before us. There was a heavy rain and, consequently, a slick road surface presented to Mrs. Saxton’s consideration. Not only would the braking efficiency of her automobile be impaired, but an attempted sudden maneuver, or change of road bed, could have easily sent her car out of control with results more disastrous than those which actually occurred.
We therefore conclude that the determination of Mrs. Saxton’s negligence under the facts most favorable to defendant is determined by the reasoning of Patterson v. St. Paul Mercury Insurance Company, 173 So.2d 224 (Ct.App. — 3rd Cir., 1965) and under the facts most favorable to her by the well-known doctrine of sudden emergency. In either light, she is exculpated.
As to the assessment of damages, the Court cannot add to or improve upon the reasoning and conclusions of the Trial Judge and we hereby adopt his opinion, as follows:
“Mrs. Saxton received contusion on her chest, severe contusion over the abdomen, bruise of the knee and laceration over the eye. She was admitted to the hospital for bed rest and routine sedation was given for pain. The laceration over the eye required suturing. These particular injuries healed without incident, except the bruise over the abdomen developed hemo-toma, which was slow in being absorbed.
“Mrs. Saxton also suffered, according to the doctors, a rather unusual and severe sprain of an ankle. The ligaments were torn away from the bone with a piece of bone remaining stuck to the ligaments. She was on crutches for six weeks after she left the hospital on September 3, 1963. Dr. Fenton followed her until February, 1964, and then referred her to Dr. Dowell, who first saw her on February 10, 1964. Throughout the time the ankle has continued to swell, and it catches when she walks. It has more tilt than the uninjured ankle and it is twisted to the outside. Dr. Dowell has made several injections of cortisone to reduce swelling and ordered her to wear a special type shoe. She was advised to do as little walking as possible. The swelling is due to fluid in the joint or to thickening of the tissues.
“Dr. Fenton thinks she will always have trouble with that ankle. Dr. Dowell, said there was still swelling on April 12, 1965, and that she has a disability of about 10% at this time, but he said he did not know whether it would be permanent or not, and that she may have some permanent disability. He described it as a rather unusual injury' and that her condition is painful and annoying.
“The evidence is convincing that Mrs. Saxton has a serious and disabling ankle condition with significant residual. I think an award of $3,750.00 is justified for Mrs. Saxton’s personal injuries.
“Mrs. Saxton operates a beauty parlor with one assistant who makes about $50.00 a week. Mrs. Saxton could not work at all while she was on crutches and because of her injured ankle she has not been able to resume full time. As she described it, the pain is not continuously excruciating, but it is sufficient to keep her from forgetting it and her business has been reduced. Her lessened earnings are definitely reflected in her income tax returns filed in evidence, showing gross income in 1962 of $10,262.35, in 1963 of $8,041.50 and in 1964 of $7,820.31. She claims $500.00 for loss of earnings as a result of her injuries. I believe the loss is several times that amount. The full amount claimed for that loss will be allowed.
“Mrs. Saxton individually incurred special damages in the following amounts: Dr. Fenton’s bill, $108.00; Dr. Dowell’s bill, $110.00; automobile damage, $360.00; Baton Rouge General Hospital bill, $308.00. *513 The total award to Mrs. Saxton individually is $5,136.00 with interest.
“A minor daughter, Gwendolyn Saxton, was a passenger in her mother’s car. Gwendolyn suffered numerous lacerations, including severe cuts over both eyes, on the lip and both knees. Dr. Fenton sutured the cuts. Her first stay in the hospital was for 10 days and later readmitted for knee surgery by Dr. Dowell, who removed part of the patella. Dr. Fenton assisted in the surgery. The doctor said she suffered a combined fracture of the patella and tearing of the patella tendons. The operation on the knee was done under a general anesthetic on September 9, 1963, and a long leg cast was applied. The cast was removed on October 14, 1963.
“Dr. Dowell explained that two problems arose after the surgery. After the cast was removed the knee scars started to widen and the patella subluxated to the outside. At the trial the scars on her face are not particularly noticeable, but on both knees a heloid (sic) condition has developed. One knee is much worse than the other. On one knee below the patella there are two hideous scars crosswise the leg. One is four inches long by one-half inch wide and rounded above the skin level. On the same leg right near and below there is a smaller flat scar two inches by three-eights. Both these scars look like raw meat. They are tender and painful. They present a horrible looking sight and are terribly disfiguring. The scars on the other knee are not nearly so noticeable. Dr. Hughes, a plastic specialist, testified that there is no treatment to help the condition and no cure for it.
“In addition to the scars Gwendolyn can bend her leg at the knee, but the knee catches and sometimes slips out of joint when she straightens her leg. This Junior High School girl formerly engaged in athletics and other physical activity, but now she cannot run or do many things which she formerly did. For the last year the doctor has been trying certain exercises of the thigh muscles to strengthen the knees. The doctor is not sure what will happen. Further surgery may be needed. The doctor said that assuming that further surgery will not be necessary, it will take six months of proper exercises under the direction of a physiotherapist to keep the patella and knee in place. She has a permanent disability of ten to fifteen per cent in the function of the leg.
“I am convinced that for her injuries and disability she would be entitled to recover in the neighborhood of $8,000.00 to $10,000.00, but because of the limited liability of the insurer and the impecunious condition of the insured an award of $6,-000.00 will be allowed. This is more than the policy limit and it is hoped that now or perhaps sometime in the future something can be collected from Eddie Stewart.
“Mrs. Saxton, as the natural tutrix of her minor daughter, incurred expenses of $16.00 due Dr. Hughes; $135.00 to Dr. Fenton; $487.50 to Dr. Dowell and $512.55 to the hospital.”
Appellant asks that we remove entirely the $1,000.00 award made against Eddie Stewart individually. This request is based upon the fact that he is a disabled veteran; unemployed and with very remote prospects of ever accumulating an estate. Although this Court agrees with the proposition that an award should be keyed to the defendants’ ability to pay, we also think that this goes to the amount of the award, not to the entire relief of defendant. Here again, we cannot say the Trial Judge has abused his “much discretion”. See Ballard v. National Indemnity Company, 246 La. 963, 169 So.2d 64.
Affirmed.

. 4.4 seconds, less reaction time of % of a second. See Blashfield, Cyclopedia of Automobile Law and Practice 6237.